THE FARMERS AND MECHANICS' NATIONAL BANK OF BUFFALO, Respondent, v. GERHARD LANG, Appellant.

W., who was engaged in business as a pork packer, and had been a borrower from plaintiff, delivered to it an instrument signed by defendant, which, after reciting that W. desired to increase his facilities for obtaining money and proposed to pledge to plaintiff property that might from time to time be in his possession, to secure discounts and loans, guaranteed to plaintiff "all such pledges of property, warehouse receipts and other vouchers" as may from time to time be given by W., and defendant also promised as follows : "That the property so transferred and set over to said bank shall not be misapplied or diverted to any other purpose while such loans or advances remain unpaid to said bank, and if any default or misappropriation of the property so pledged shall be made, I do promise and agree to make good any deficiency, and fully satisfy the stipulations contained in said receipts or other vouchers therefor, without requiring any notice to me of the several loans and discounts." Held, that the guaranty was simply against a diversion or misappropriation of property which should be pledged to plaintiff by W., and did not cover the risk of a false or fictitious pledge ; that defendant undertook that if such pledge was good when taken it should be kept good thereafter, not that W. should actually have in his possession the property which he should profess to pledge.

Also held, that conceding defendant took the risk of W.'s imposing upon plaintiff, without its fault, false and spurious security, he did not take the

risk of a waiver by plaintiff of any security or of an acceptance of security known by it to be spurious and sham ; that defendant had the right to assume plaintiff would make its loans on real, not sham security.

Accordingly *held*, that the exclusion of evidence offered by defendant to the effect that where alleged warehouse receipts were given by W. to plaintiff, the former in fact had no such property on hand as was specified therein, was error.

Also *held*, that evidence to the effect that W., with the knowledge and assent of plaintiff, but without the knowledge or consent of defendant, shipped property covered by said receipts, and took railroad shipping receipts which he pledged for a new discount, was erroneously excluded.

So also *held*, as to the exclusion of evidence, that before the making of any of the discounted notes described in the complaint, W. informed plaintiff's cashier that it was impracticable for him to set aside property described in the receipts, that the cashier consented that this should not be done, and that thereafter W. ceased to make any attempt to set aside or to have on hand property so described.

W. delivered to plaintiff as security, instruments in form and purporting on their face to be issued under the act in relation to warehouse receipts (Chap. 326, Laws of 1858, as amended by chap. 353 of the Laws of 1859, and by chap. 440 of the Laws of 1866). They were signed by W. and acknowledged the receipt from himself, as owner of the property specified. *Held*, that, as between the parties, they derived no force or efficacy from said act, and in no manner transferred the possession of the property or represented any such actual transfer ; that there was no valid pledge or actual warehouse receipt, but a transfer of title, as collateral, which could operate only as a chattel mortgage.

*F. & M. Nat'l Bk.* v. *Lang* (22 Hun, 372), reversed.

(Argued November 29, 1881; decided December 13, 1881.)

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, entered upon an order made October 5, 1880, which affirmed a judgment in favor of plaintiff, entered upon a verdict. (Reported below, 22 Hun, 372.)

This action was brought upon the written instrument hereinafter set forth.

In 1874, one Frank Weppner, who was engaged in Buffalo as a pork packer, and who had been a customer of the plaintiff, applied to the plaintiff to extend his line of discount, and on the 30th of October, in that year, he procured and delivered to the plaintiff, in the presence of the defendant, a written instru-

ment executed by the defendant, of which the following is a copy:

"BUFFALO, *October* 30, 1874.

" Whereas, Frank Weppner is engaged in business in the city of Buffalo, as pork packer and dealer in meats, and is desirous of increasing his facilities for obtaining money at the Farmers and Mechanics' National Bank of Buffalo, and for that purpose proposes to pledge the property that may from time to time be in his possession to said bank, as security for discounts, loans and advances that may be made to him by said bank in the course of his business:

" Now, in consideration of the premises, and of $1 to me, the undersigned, in hand paid, I do hereby promise and guarantee to said bank all such pledges of property, warehouse receipts and other vouchers that may from time to time be given by said Frank Weppner as collateral security to said bank for advances, discounts and loans of moneys, and promise on my part that the property so transferred and set over to said bank, shall not be misapplied or diverted to any other purpose while such loans or advances remain unpaid to said bank, and if any default or misappropriation of the property so pledged shall be made, I do promise and agree to make good to said bank any deficiency, and fully satisfy the stipulations contained in any such receipts or other vouchers therefor, without requiring any notice to me of the several loans and discounts that may be made by said bank to said Weppner.

"(Signed)    GERHARDT LANG (L. s )"

Between the time of the execution and delivery of the guaranty and the 30th of January, 1877, when Weppner failed, he procured his notes to be discounted by the plaintiff, and he attached to each note an instrument in the form of a warehouse receipt signed by him as collateral security for the payment of the note.   Of these instruments the following was the form:

"BUFFALO,            187

Warehouse receipt and voucher executed and delivered under and in pursuance of the act chapter 326 of the Laws of

New York passed 1858, and the acts amendatory thereof passed in 1859 and 1866.

Received in store from F. Weppner as owner, at his own premises bounded by William, Carney and Howard streets, and Filmore avenue, the following property, viz.:

[Here was inserted a description of the property] to be held subject to the order of the Farmers and Mechanics' National Bank; and which property I agree to deliver on the order of the said bond indorsed hereon.

F. WEPPNER.

I hereby certify that the said property has been paid for, and is now free from all liens, charges and incumbrances, and hereby transfer title to said bank.

F. WEPPNER."

The court directed a verdict for the balance due plaintiff on the notes.

The rulings upon the trial which present the questions determined are set forth in the opinion.

*George F. Comstock* for appellant. The court erred in excluding as immaterial and incompetent defendant's offer to prove that each of the notes was discounted at the rate of sixteen per cent per annum, and that the bank received the discount and excess of interest when the notes were so discounted. (*Marie* v. *Garrison*, 83 N. Y. 14; *Bank* v. *Lewis*, 75 id. 516; 15 U. S. Stat. at Large, 99, § 30; U. S. R. S., § 5198.)

*Spencer Clinton* for respondent. When the words in the operative part of an instrument are clear and unambiguous they cannot be controlled by recitals. (Chitty on Contracts [10th Am. ed.], 90.) A promise or covenant must be taken most strongly against the promisor or covenantor. (*Marvin* v. *Stone*, 2 Cow. 781; *Ripley* v. *Larmouthe*, 56 Barb. 21; *Gifford* v. *First Church of S.*, id. 114.) When an offer of evidence contains any matter not admissible as evidence, it is proper for the court to reject the offer as a whole. (*Hager* v. *Edmunds*, 4 Barb. 256; *Hawley* v. *Black*, 26 How. Pr. 97.)

The offer must contain in itself, or by reference to something else, either already in evidence or offered as yet to come, sufficient to show that it is competent. (*Van Buren* v. *Wells*, 19 Wend. 203.) The counter-claim of usury was properly excluded. The offer to show usury did not conform to the allegation in the answer. (*Griggs* v. *Howe*, 31 Barb. 100; affirmed, 2 Abb. Ct. of App. Dec. 291; *S. C.*, 2 Keyes, 574.) This was an action on contract, but the alleged counter-claim was not, but was a penalty imposed by statute. (*Hade, Receiver*, v. *Mc Vay*, 31 Ohio, 231; *Barnet* v. *Muncie Nat. Bk.*, 98 U. S. 555; *Nat. Bk. of Auburn* v. *Lewis*, 81 N. Y. 15.) It would be essential even to a recovery by Weppner to show that the loans upon which the excessive interest was received had been paid. (*Wheelock* v. *Lee*, 64 N. Y. 242.) As between Weppner and the plaintiff, Weppner would be estopped from denying that he had the property. (*Moses* v. *Kreigh*, 49 Ill. 84; *McNeil* v. *Hill*, 1 Wool. [U. S. Ct.] 96.) The renewal of notes secured by a mortgage or judgment is not a satisfaction of the original debt so as to affect the security. (*Dunham* v. *Day*, 15 Johns. 554; *Brinkerhoff* v. *Lansing*, 5 Johns. Ch. 65; *Bk. of Utica* v. *Finch*, 3 Barb. Ch. 293.) The claim that the receipts were invalid, because issued by Weppner for his own property, in his own warehouse, was not a valid objection to them. (*Shepardson* v. *Cary*, 29 Wis. 34; *Gibson* v. *Stevens*, 8 How. [U. S.] 384; *Gibson* v. *The Chillicothe Bk.*, 11 Ohio St. 312.)

Finch, J. If the defendant has incurred the liability asserted in this action, it is by force of his contract of guaranty. The just construction of that contract underlies the principal questions discussed upon the appeal. While the favor which the law shows to a surety serves to shield him from implied engagements, and holds him only to the express stipulations of his contract, yet the rule of construction applicable to his written agreement is in no respect changed or modified by the mere fact of his suretyship. We are still to apply the ordinary rules, and require exact performance of express stipulations.

(*Gates* v. *McKee*, 13 N. Y. 232; *Rochester City Bank* v. *Elwood*, 21 id. 88.)

It is very plain that the contract of guaranty contemplated a responsibility on the part of the defendant, entirely different from an absolute liability for the whole debt of his principal. Both the form and substance of the contract exclude the idea of any such purpose or understanding. If that had been intended by the surety, or expected by the creditor, the engagement entered into would have taken an entirely different shape. The defendant did not guaranty the payment of the debt at all; if he had done so, he would have assumed the full risk of his principal's solvency and honesty, with no intervening protection or security. The risk he in fact assumed was less in degree, and was evidently founded upon the presence of an intervening security, which lessened the magnitude of his obligation, and gave him, at least, some semblance of protection. The facts proven upon the trial clearly demonstrate the truth of this conclusion. It is important to consider them in detail, for the aid which they will give us in reaching a just construction of the contract.

Frank Weppner, who incurred the debt sought to be recovered of the defendant, was a pork packer and dealer in meats. In the transaction of his business he appears to have been more or less a borrower, and to have needed accommodation as such at the bank. He desired to increase his facilities for obtaining the loan and use of money, and for that purpose proposed to pledge to the plaintiff the property which might from time to time come into his possession, as security for discounts, loans and advances to be made by the bank. It was not intended that the property pledged should actually and in bulk be transferred to the possession of the pledgee, but that result was to be reached by setting aside specific property to be represented by what are termed in the case "warehouse receipts." Although these assumed such form, and purported on their face to be issued under and in accordance with the act of 1858, as amended in 1859 and 1866, they were not such at all, and, as between the present parties, derived no force or efficacy from that act. (*Yenni*

*v. McNamee,* 45 N. Y. 614.) They in no manner transferred the possession of the property, or represented any such actual transfer. There was, therefore, never any valid pledge by the borrower, nor any actual warehouse receipt. What was so called simply operated in each instance to transfer the title of the property described, as between Weppner and the bank, and such transfer, being collateral to the payment of a debt, could operate only as a mortgage. (45 N. Y. *supra.*) The recital in defendant's agreement indicated an intention to pledge property to the bank, while the actual arrangement was valid only as a mortgage. Waiving that difference, and assuming that defendant's guaranty was nevertheless applicable to the actual form of the transaction, it is evident that such guaranty went upon the hypothesis that something other than the debt itself was to be guaranteed. There were two sources of danger to the bank in carrying out its arrangement, one of which it could itself guard against, and the other of which it could not. The debtor might transfer, in form, property which he did not have in fact. The bank could have known at each renewal, and upon the occasion of each advance, whether its debtor's mortgage was upon property actually existent and in his possession. It could make sure of that if so disposed. But having done so, a danger remained against which it could not well guard except by some sufficient guaranty. The debtor might divert or misappropriate the property after having transferred its title to the bank, or lose it through the action of other creditors, against whom the unfiled mortgage would be ineffectual as a protection. The bank, therefore, might choose to demand a guaranty against both risks, or only the latter, and the defendant's guaranty might by its terms extend to both, or only one. And whether it covered both, or only the latter, is the question here in dispute.

Let us turn now to its language. There are but two expressions in it, which can possibly be construed to carry its operative force beyond an agreement to protect only against a diversion of property already pledged or mortgaged. One of these is the phrase, "I do hereby promise and guaranty to said bank,

all such pledges of property or warehouse receipts, and other vouchers;" and the other is, "if any *default* or misappropriation of the property *so pledged* shall be made, I do promise and agree to make good to said bank any *deficiency*, and fully *satisfy the stipulations contained in any such receipts or vouchers therefor*." It is difficult to divest ourselves of the impression that both clauses assume property in the possession of the debtor actually pledged, as the basis upon which the guaranty was to be operative and serve as protection. The borrower's purpose to make pledges of property actually possessed is first recited, and then the guaranty is of all *such* pledges; not that they will or shall be actually made, for that is assumed, and the bank could compel it before parting with its money; but that, having been once made, "*such* pledges" should be adequate and sufficient, and not be diverted or misappropriated. The allusion to any "deficiency," points in the same direction. It indicates, not the want of a pledge at all, but the presence and existence of an actual pledge, which might prove inadequate and insufficient. An agreement that a pledge made shall prove adequate, and not result in a deficiency, can with difficulty be transformed into a covenant, that an actual pledge shall be made. The other clause relied upon leads us in the same direction; stress is put upon the agreement to "fully satisfy the stipulations" contained in the receipts. They begin with an acknowledgment that Weppner had stored with Weppner certain specified property, and then covenant or stipulate that it shall be held subject to the order of the bank, and delivered on its order; that the property has been paid for, is free from incumbrance, and title is transferred to the bank. It is hence argued that the existence of the property professed to be pledged, in Weppner's hands at the time of the receipt, is its most important stipulation, and covered by defendant's guaranty; but the language of the latter instrument is peculiar. The surety's agreement is not absolutely to satisfy the stipulations of the receipt, but upon condition in a specified emergency. "If," it says, "any default or misappropriation of the property *so pledged* shall be made," then, in that

event, the stipulations of the receipts are to be fulfilled. The meaning appears to be that the receipts, if good when taken, shall be kept good thereafter, and that the guaranty should apply, not to the risk of a false or fictitious pledge, against which the bank could protect itself before making its loan, but to the risk of an after default or misappropriation against which the bank could not guard, because it had parted with its money. If we adopt a different construction from this, we must confront and struggle with the difficulty already suggested. A guaranty that the property professedly pledged actually exists, is in the ownership and power of the pledgor, is totally unincumbered, and will prove adequate to the payment of the debt, and shall not be diverted or misappropriated, is plainly tantamount to an absolute engagement to pay the debt in full. Such a liability was never intended or understood. The guarantor supposed, and had a right to suppose from the character of the arrangement recited in his contract, and made between the borrower and the bank, that an intervening security stood between himself and danger; that for every loan, the bank would take, by way of pledge or warehouse receipt, or other sufficient voucher, a lien upon property actually possessed by the debtor to an amount reasonably sufficient to protect the loan; that this would be done in good faith by the lender for its own safety and protection, and in accordance with its condition to that effect imposed upon the borrower; that such security having thus been taken, he, the guarantor, was simply bound for its sufficiency and honest continuance; and that instead of binding himself to an absolute liability for the whole debt, with no manner of protection beyond the honesty and solvency of the debtor, he would, all the time, have between him and danger an actual lien of the bank upon actual property pledged or transferred. We have no doubt whatever that all the parties to this agreement thus understood it.

The guarantor had the right to assume that, under the arrangement to which he became a party, the bank was to make its loans upon a real and not a sham security; that having the power, before parting with its money, to acquire a real lien

upon actual property, and having the consent of the debtor to give such lien, it would do so in each instance with ordinary prudence and entire good faith; and that then, and not until then, did the liability of the guarantor begin. By the terms of his agreement he was entitled to no notice of the several loans and discounts. Unless he stood at the bank all day, and every day, he could not know when one of these transactions was occurring, or himself look to the faithful carrying out of the arrangement. All this he was compelled to intrust to the prudence and good faith of the bank. . It is a construction which we cannot adopt, to say that the bank was at liberty, without the exercise of the least care or discretion, to take a sham and spurious security for the loan of its money, and hold the guarantor liable for the consequences of its own carelessness.

Resting upon this construction of his contract, the defendant sought to make it available for his protection by numerous offers of evidence, which were all rejected.

He offered to show that when the alleged warehouse receipts were given, there was, in fact, no such property on hand as was specified on their face; that on or after the 26th day of December, 1876, when the notes held by the bank aggregated more than $30,000, and were accompanied by receipts professing to transfer as collateral an equal amount of property, the debtor did not, in truth, have on hand an amount of such property exceeding $4,000 in value; and that on one occasion Weppner, with the knowledge of the bank, shipped away property covered by the receipts to the amount of $5,000; took for it a railroad shipping receipt, and then pledged that to the bank as security for a new discount; and so, without the knowledge or consent of the surety, but with the privity and consent of the bank, stripped $5,000 of the guaranteed receipts of the property they represented, and left the surety, to that extent, without a shadow of protection. This proof was rejected as immaterial, and was so upon the construction which prevailed below. Upon our view of the contract, it was material and competent. It tended to show that the rights of the surety were swept away, and his liability in-

creased, not only by the careless neglect of the conditions imposed on the debtor, but by their conscious waiver. This last fact was more plainly covered by another ruling on the trial. The defendant offered to prove that after the execution of the written guaranty, and before the making of any of the notes described in the complaint, the borrower, Weppner, informed the cashier of the plaintiff that it was impracticable for him to set aside property described in the receipts, as he was selling the property daily, and the notes were so numerous; that the cashier replied that he supposed that would do — that they had a bond which would cover it; and that thereafter Weppner ceased to make any attempt to set aside, or have on hand the property described in the receipts. This evidence was rejected. The objection to it was put partly upon the ground that it was not within the issues. We think it was. A careful reading of the answer satisfies us that it did not need amendment to make the evidence admissible. While it does not set out every precise detail of the offer, it does, in substance, allege a change in the arrangement made between Weppner and the bank, by which the former was no longer required to set aside the specific property described in the receipts, and that thereafter, with the knowledge of the bank, he failed to keep on hand any such specific property. The further and principal objection insists that the evidence was immaterial. We cannot so regard it. Upon either construction of the contract it bears heavily and strongly upon the rights of the parties. If the interpretation we have given it be correct, the very basis upon which the defendant contracted was taken away without his knowledge or consent, to his manifest injury. He relied, and had a right to rely, upon the intervening security provided by the arrangement to which he became a party; and when the bank and the debtor, without his knowledge, dispensed with that security, they stripped him bare to a risk and danger never contemplated, and which he never assumed. If we take the bank's construction of the guaranty, the result is the same. On that theory the defendant did take the risk of the imposition by Weppner upon the bank, of a false

and spurious security, fair on its face, but having no property or safety behind it; he did take the risk of the bank being imposed on without its fault or intention; but he plainly did not take the risk of a waiver by the bank of the right to the only protection which he had; of the acceptance by it of a security known to be spurious and sham, and representing nothing; of permission given by it to the debtor to omit the very safeguards upon which alone the guarantor could rely for some measure of safety. We can see no view of the situation which justifies the rejection of this evidence, or denies to the fact sought to be proved its material bearing upon the ultimate determination of the rights of parties.

The case was tried upon a theory different from that which we have thus indicated, and which was challenged upon the trial by other and numerous objections and exceptions.

The judgment should be reversed and a new trial ordered, costs to abide the event.

All concur.

Judgment reversed.