THE FIRST NATIONAL BANK OF MONROE vs. EDGERTON and others.

*September 5 — November 21, 1882.*

*Guaranty — Construction of letter of credit — "Draft against shipments."*

The firm of E., P. & W. stated to a bank, by letter and telegrams, that O. W. wished to buy stock and ship to them, and that they would accept drafts from him "for a reasonable amount, as advances on stock;" that they would "pay O. W. draft made against shipments of live hogs, stock to amount of $1,500;" also "O. W. draft against live stock good any time for $1,500." *Held:*

· (1) E., P. & W. were not guarantors within the meaning of the rule requiring contracts of guaranty to be construed strictly in favor of the guarantor.

(2) Construing the term "draft against shipments" in the light of all the circumstances under which the contract was made, and the uniform course of dealing between the parties under it, E., P. & W. were bound to pay all drafts discounted in good faith by the bank, subject to the limitation of $1,500; and the risk of deficiency of shipments to meet all drafts so discounted was upon the defendants and not upon the bank.

APPEAL from the Circuit Court for *Milwaukee* County.

The action is upon a draft for $800, drawn by one O. Warfield upon the defendants, payable to the order of the plaintiff, and dated Monroe, Wisconsin, February 5, 1881. The plaintiff bank discounted the draft and duly presented it to the defendants for payment. The defendants refused to pay the same, and it was duly protested for nonpayment. The draft was discounted by the bank under the following circumstances: The defendants as partners, under the firm name of *Edgerton, Peck & West,* were engaged at Milwaukee in the business of receiving and selling consignments of hogs and live stock; and Warfield, the drawer of the draft in suit, desired to engage in the business of buying hogs and live stock at Monroe and shipping the same to the defendants at Milwaukee, to be sold by them. Thereupon the defendants gave the plaintiff a letter of credit, contained in the following letter and telegrams addressed respectively to the president and cashier of the plaintiff:

"Milwaukee, Wis., November 3, 1880.

"*A. Ludlow, Esq.*— Dear Sir: O. Warfield writes that he wishes to buy stock and ship to us, and have us write you that we will accept drafts from him, which we will do for a reasonable amount, as advances on stock.

"Yours truly,    "Edgerton, Peck & West."

"Milwaukee, November 6, 1880.

"*To J. B. Galusha, Cashier, Monroe, Wis.*: We will pay O. Warfield draft made against shipments of live hogs, stock to amount of fifteen hundred (1,500) dollars.

"Edgerton, Peck & West."

The First National Bank of Monroe vs. Edgerton and others.

"MILWAUKEE, November 10, 1880.

"*J. B. Galusha, Cashier:* O. Warfield draft against live stock, good any time for fifteen hundred (1,500) dollars.

"EDGERTON, PECK & WEST."

From November 8, 1880, to February 7, 1881, inclusive, Warfield shipped from Monroe to the defendants, at Milwaukee, fifty-seven car loads of hogs and cattle. During the same time the plaintiff bank discounted bills drawn by Warfield on the defendants amounting to over $55,000, all of which were paid by the defendants on presentation, except the last, which is dated February 5, 1881, and is the draft in suit.

The complaint alleges that the defendants agreed to pay all drafts drawn by Warfield against shipments of hogs and live stock, and that the draft in suit was drawn by Warfield to apply towards payment of hogs and live stock shipped to the defendants. The answer admits the contract as stated in the complaint, and denies that the draft of February 5th was drawn against shipments. The answer also contains a counterclaim to the effect that two drafts, aggregating $1,500, discounted by plaintiff about February 1st, and paid by the defendants February 3d, were not drawn against shipments as the plaintiff well knew, and that out of the proceeds of said two drafts Warfield purchased a car load of hogs, and shipped the same to Chicago on account of the plaintiff, February 2d; and that the proceeds thereof were paid to the plaintiff, and applied in payment of an indebtedness of Warfield to it, arising out of another transaction between them in which the defendants were not interested; and also, that when it discounted the drafts of February 1st the plaintiff knew that Warfield intended to apply the proceeds for its benefit, as aforesaid. The answer further alleges, by way of counterclaim, that the defendants have paid Warfield's drafts upon them, discounted by the plaintiff, to an amount exceeding the proceeds of shipments over $1,800, for which sum, or the balance thereof, if plaintiff's demand be allowed, judgment is demanded. The jury found

for the defendants, and assessed their damages at $1,617.81. A motion for a new trial was denied. The defendants remitted $754.81 from the verdict, and judgment was entered against the plaintiff for $853, and costs. The foregoing facts are undisputed. The case is further stated in the opinion. The plaintiff appealed from the judgment.

For the appellant there was a brief by *Finches, Lynde & Miller*, its attorneys, and *W. P. Lynde*, of counsel, and oral argument by *Mr. Lynde*.

For the respondents there was a brief by *Markham & Noyes*, and oral argument by *Mr. Noyes*. They contended, *inter alia*, that the defendants were guarantors or sureties to the bank, under the letter of credit, and that the authority therein conferred must be strictly followed to make the defendants liable. Edwards on Notes and Bills, 239, 240, 422; Baylies on Sureties, 121; *Ulster Co. Bank v. McFarlan*, 5 Hill, 432; *Parsons v. Armor*, 3 Pet., 413; *Baring v. Clark*, 19 Pick., 220; *Attwood v. Munnings*, 7 B. & C., 278; *Fenn v. Harrison*, 3 Term, 757; *Hall v. Peyser*, 126 Mass., 195; *Bank v. Rice*, 98 id., 288; *S. C.*, 107 id., 37; *Commercial Bank v. Eddy*, 7 Met., 181; *Harrison v. Smith*, 2 Sweeney, 669; *Bank v. Worthington*, 12 Wend., 593; *Walrath v. Thompson*, 6 Hill, 540; *Leeds v. Dunn*, 10 N. Y., 469; *Talmadge v. Williams*, 27 La. Ann., 653. Under the special and limited power and agency given the bank it was bound at its peril to see and know that shipments were made to cover all drafts which were presented for discount. *Murdock v. Mills*, 11 Met., 5; *Schimmelpennich v. Bayard*, 1 Pet., 264; *Carrollton Bank v. Tayleur*, 16 La., 490; *Rawls v. Deshler*, 3 Keyes, 572; *Morrell v. Cowan*, 23 Eng. Rep. (Moak), 477; *Evans v. Whyle*, 5 Bing., 485; *Warre v. Calvert*, 7 Ad. & El., 143.

The following opinion was filed September 19, 1882:

LYON, J. It is manifest from the pleadings and the amount of the verdict that the jury found against the

plaintiff on the cause of action stated in the complaint. On no other hypothesis could the verdict have been for so large a sum. The learned circuit judge said to the jury that the pleadings of both parties construed the contract as only authorizing the bank to discount drafts drawn against shipments, and gave instructions prayed by both parties, the effect of which was to submit to the jury the question whether the draft in suit was so drawn. The judge gave no further construction to the contract, and none was asked for by either party. There is no room to doubt that the jury found the draft was not so drawn.

The first question to be determined is, therefore, does the evidence support the verdict in this behalf? To answer this question correctly it is necessary to determine what the contract contained in the letter of credit really is — what are the rights and obligations of the contracting parties under it. The parties have determined for themselves that the plaintiff was only authorized by the letter of credit to discount drafts drawn by Warfield against shipments of hogs and live stock to the defendants. With this determination the circuit judge was content and so is this court, notwithstanding the last telegram, which presumably was intended to explain the letter of November 3d and the telegram of November 6th, speaks only of drafts "against live stock." The question still remains, however, as to what was intended by the term "draft against shipments" — in what sense it was employed in the contract. The term as there used is somewhat ambiguous. It may mean (as claimed on behalf of defendants) that the defendants were not bound to pay any draft until a shipment was actually made to meet it, and hence, that if the plaintiffs discounted Warfield's drafts before such actual shipments were made, they did so at their peril of the shipment not being made at all. Such would be the inevitable construction had the contract required, as letters of credit for advances frequently, perhaps usually, require,

that the shipping bill shall accompany the draft. On the other hand the term may have been employed by the defendants merely to express the use to which the proceeds of the drafts were to be applied by Warfield. It may have been used in the sense that the defendants would have used it had they made an advance to Warfield over their own counter in Milwaukee, before any shipments had been made, stipulating at the same time that it was an advance against shipments. Of course the term so used would mean future shipments. Why may it not mean the same thing when employed by them in authorizing the plaintiff to make the advances for them instead of doing so directly?

The learned counsel for the defendants, in his very able and ingenious argument of the cause, invoked, in support of his construction of the contract, the rule that contracts of guaranty are to be construed strictly in favor of the guarantor. But the defendants are not guarantors within the true sense and meaning of that rule. The drafts were drawn and discounted in furtherance of a business adventure in which Warfield and the defendants alone were engaged, and into which they had entered for their mutual profit. The bank had no interest in the business, and derived no profits from the discounts except a trifling premium charged on such drafts. If any party to these transactions stands in the relation of a surety, it is the bank rather than the firm upon which the drafts were drawn.

In giving construction to the language employed in the contract, it is proper to take into consideration the circumstances under which it was made, and the uniform course of dealing between the parties under it, for the purpose of ascertaining the sense in which the term "draft against shipments" was used therein. The intention of the parties in that behalf, when ascertained, must control the construction of the instrument, if no violence be done to the language employed. See *Gillmann v. Henry*, 53 Wis., 465, and cases cited.

The First National Bank of Monroe vs. Edgerton and others.

Although there is no direct testimony on the subject, all reasonable inferences and presumptions from the evidence are that Warfield had no means with which to make purchases of stock for shipment to the defendants, other than the proceeds of his drafts on them which were discounted by the bank. Presumably his purchases were for cash, and it was necessary that he should have discounts for considerable sums before any actual shipments could be made. This condition of things was also liable to exist, and, if we understand the evidence correctly, did frequently exist, after the first shipment had been made. That is to say, it seems that Warfield needed money on his drafts at different times with which to make purchases, when he was not prepared to make shipments. We think it may reasonably be inferred that these contingencies were within the contemplation of the defendants when they gave the letter of credit. If they were not we should look for some further stipulation in the letter, as that shipping bills should accompany the drafts, or that drafts should be drawn only against shipments actually theretofore made, or some equivalent limitation of the defendants' liability. Then, again, from the first, drafts were discounted by the bank without regard to shipments, and many of them were discounted and some were paid by the defendants without objection, before any shipment had been made out of the proceeds of which the defendants could indemnify themselves. In short, the whole course of dealing between the parties shows that the drafts were discounted and paid without regard to any specific shipment, and that neither party understood that the bank discounted the drafts at the risk of losing its money if shipments were not made to meet them.

Upon the whole case, therefore, we conclude that the defendants were bound to pay all drafts discounted in good faith by the bank, subject to the limitation of $1,500, specified in the letter of credit, and that the risk of deficiency of

shipments to meet all of the drafts so discounted was upon the defendants and not the bank. This seems the more reasonable when it is considered that the defendants had the means of knowing constantly the state of their accounts with Warfield, which the bank had not, and it was competent for them at any time to cancel or further restrict their letter of credit, if Warfield was drawing too heavily upon them. Under this rule, and in view of the fact that shipments were made by Warfield, February 7th,— two days after the draft in suit was discounted — which netted the defendants over $1,300, the conclusion seems inevitable that the plaintiff should have recovered the amount of such draft. Because the evidence establishing the liability of the defendants on the draft in suit is conclusive, the motion for a new trial should have been granted.

In respect to the counterclaim, a few observations must suffice. That portion of it which relates to the drafts amounting to $1,500, paid by the defendants February 3d, is disposed of adversely to the defendants by what has already been said. Those drafts are upon the same footing with the draft in suit. Obviously, the damages assessed by the jury on the counterclaim were for the amount of those drafts paid February 3d, and interest thereon. It is also quite apparent that the sum for which the defendants entered judgment was the amount realized by the bank as proceeds of the car load of hogs shipped to Chicago, February 2d, and the interest thereon. The facts connected with this shipment are these: January 25, 1881, Warfield purchased a lot of cattle and paid for them by a draft on Young & Co., of Chicago, to whom the cattle were consigned. The draft was discounted by the bank, and the consignment made on its account. The proceeds of the consignment were received by the bank and placed to the credit of Warfield, but the same did not pay the draft in full. The deficiency was about $800. Thereupon Warfield shipped the car load of hogs before

The First National Bank of Monroe vs. Edgerton and others.

mentioned to Young & Co., on account of the bank, to make up the deficiency. The bank received the proceeds and credited the same to Warfield, which paid the deficiency within about $100.

Without entering into a discussion of the subject we will merely state our opinion as to what is the law applicable to this branch of the case. If the officers and managers of the bank colluded with Warfield to obtain money on drafts which the defendants paid on the faith of shipments to be made to them, with the intention on the part of Warfield and the bank that the former should use the money in the purchase of hogs to be shipped to Chicago on account of the bank, to pay the deficiency in the cattle transaction, it was a fraud upon the defendants, and they should be allowed on their counterclaim the amount of money thus misappropriated. But if the drafts were discounted by the bank in good faith, in the belief that Warfield intended to ship the stock purchased with the proceeds to the defendants, and without notice to the contrary until after the shipment to Chicago had been actually made, we think the counterclaim fails, although the proceeds of the Chicago shipment were afterwards paid to it and applied on Warfield's indebtedness growing out of the cattle shipment to Chicago.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial.

Upon a motion for a rehearing, counsel for the respondent cited further, as to the construction of the letter of credit, *Boyce v. Edwards*, 4 Pet., 111, 123; *Barney v. Newcomb*, 9 Cush., 46–51; *Decatur Bank v. St. Louis Bank*, 21 Wall., 294; *F. & M. Bank v. Lang*, 87 N. Y., 214–218; *Birckhead v. Brown*, 5 Hill, 634–640; *Nichols v. Palmer*, 48 Wis., 110.

The motion was denied November 21, 1882.