### PEOPLE *v.* E. REMINGTON & SONS.

*(Supreme Court, General Term, Fourth Department. February, 1891.)*

**1. INSOLVENCY—PROOF AND PAYMENT OF CLAIMS.**
Where the receiver of an insolvent corporation has sufficient assets in his hands, he will be required to pay the same dividend on an unpaid claim as he has paid on other claims, though such claim was not proved against the estate within the time required.

**2. CONTRACT—CONSTRUCTION—LIEN FOR ROYALTIES.**
An agreement to pay a certain royalty for the right to manufacture and sell a certain article is a personal contract, and a claim for royalties is not a lien on the articles manufactured.

**3. SAME—WHEN CLAIM ACCRUES.**
In such case, the claim for royalties does not accrue until the articles are both manufactured and sold.

**4. SAME—WHAT CONSTITUTES SALE—CHATTEL MORTGAGE.**
In such case, giving a chattel mortgage on the articles manufactured is a sale which will render the royalties due and payable.

**5. CHATTEL MORTGAGE—WHAT CONSTITUTES—PLEDGE.**
A writing executed by a debtor, reciting that the debtor has sold to his creditor certain goods, which are held by the creditor as collateral security for the debt, and that said goods are stored in a certain warehouse, is a chattel mortgage, and not a pledge.

KENNEDY, J., dissenting.

Appeal from special term, Jefferson county.

The Lee Arms Company made application to this court by petition for an order instructing the receivers in this action to pay to the petitioner in full certain royalties claimed by it. The contract under which such royalties were claimed conveyed to E. Remington & Sons, or their successors, the sole and exclusive right or license to manufacture, use, and vend to others certain fire-arms mentioned and described therein. E. Remington & Sons, in consideration thereof, and for the right to manufacture, use, and sell the same, agreed to pay to the Lee Arms Company the sum of $1.55 for each arm manufactured and sold; the same to be paid trimonthly, at the end of each and every three months. The claim was for arms manufactured by E. Remington & Sons upon which no royalties had been paid when the corporation was dissolved. Temporary receivers of E. Remington & Sons were appointed April 21, 1886. The corporation was dissolved, and the temporary receivers were made permanent receivers, June 4, 1886. At the time the receivers were appointed, the corporation had at its works 156 finished and 9 unfinished Lee arms, making 165 in all. The Lee Arms Company has purchased some of these arms of the receivers, and has been allowed royalties on 30, leaving 135 upon which no royalties have been paid or allowed. At the time of the appointment of the temporary receivers, as well as when such corporation was dissolved, there were in the possession of certain creditors of the corporation 8,310 Lee arms. These arms were held by such creditors, under bills of sale previously given by E. Remington & Sons to them, as security for money loaned to E. Remington & Sons. The arms so held have been disposed of in some instances by the creditors who held them, and in other cases, after default, they have been redeemed by the receivers, and disposed of by them. On the hearing of this motion, the court denied the motion of the petitioner, but held that the Lee Arms Company was a creditor of the estate of E. Remington & Sons to the amount of $11,990.80 for royalties on 7,736 arms; that the petitioner was entitled to have its claim for this amount, and have the same rights and benefits thereon, so far as the assets of E. Remington & Sons remaining undistributed might render it possible; and that the receivers should pay the Lee Arms Company the same *pro rata* dividends on said claim that had been paid by them to general unpreferred creditors of the corporation, so far as the assets of the corporation then remaining undistributed might render it possible, and such further *pro rata* dividends as should thereafter be by them paid to general unpreferred creditors. From the order denying the prayer of its petition the Lee Arms Company appealed, and from the remainder of the order an appeal was taken by the receivers.

Argued before MARTIN, P. J., and MERWIN and KENNEDY, JJ.

*Thomas Richardson*, for receivers. *Hornblower & Byrne*, for Lee Arms Company.

MARTIN, P. J. We concur in the conclusion of the special term that, if there were assets in the hands of the receivers sufficient to pay the proper dividend upon the claim of the Lee Arms Company, it should be paid, although the time to prove debts against the estate had expired; and therefore are of the opinion that that part of the order which was appealed from by the receivers should be affirmed. This leaves for consideration that portion of the order which denied the petition of the Lee Arms Company for a direction to the receivers to pay to the petitioner its royalties in full.

The question presented at the outset is whether the royalties which were due the Lee Arms Company constituted a debt against the estate in the hands of the receivers to be paid by them as other debts against the estate were paid, or whether its claim for such royalties could properly be made against the receivers, and should be paid by them in full. By an examination of the contract under which these royalties were claimed, it becomes quite obvious

that it was not the intent or purpose of the contract to give the Lee Arms Company any lien upon the arms manufactured under the license therein for the·royalties agreed to be paid. It contained, at most, a simple agreement by E. Remington & Sons to pay the royalties therein mentioned. The agreement was but the personal agreement of the corporation to pay, and no lien was given or intended. Nor do we find anything in this case as presented on this appeal which would justify the conclusion that the Lee Arms Company had any legal or equitable lien on the arms in question for such royalties which entitled it to its pay in full, or in preference to other creditors. In determining whether the petitioner's claim for these royalties was against the estate, or against the receivers, it becomes material to ascertain when the claim first came into existence. If it came into existence before the receivers were appointed, then it seems to be admitted by all that it is against the estate only, and has no preference over claims of other creditors. If, however, it arose subsequent to their appointment, then it is claimed that the receivers should be directed to pay it in full. The manifest purpose of the license contained in the contract between these corporations was to convey to E. Remington & Sons the right to manufacture and sell arms under the Lee patents. The license given was not alone to manufacture, but to manufacture and sell. For the right to manufacture and sell a royalty of $1.55 was to be paid on each arm manufactured and sold. These royalties were not to be paid until the arms were both manufactured and sold. The claim that the debt or liability arose when the arms were manufactured, and that its payment only was postponed until after a sale, cannot, we think, be sustained. We are of the opinion that no debt or liability existed until the arms were both manufactured and sold.

It appears by the papers read on this motion that 165 arms were on hand at the armory of E. Remington & Sons when the receivers in this action were appointed. Upon 30 of these royalties have been paid or allowed by the receivers. On the remaining 135 no royalties have been paid. The royalties on that number amounted to the sum of $199.25. As it is not claimed that there was any sale of these arms until after the receivers were appointed, it follows, we think, that this sum should be paid by the receivers in full, if they have sufficient funds in their hands.

The appeal book also discloses that, when this action was brought, all the other arms in question had been transferred by bills of sale given by E. Remington & Sons as security for money borrowed by it at the time of the several persons, firms, or corporations to which they were given. There had been a default in each case·in the payment of the debt thus secured, or some portion thereof. It is perhaps proper, before proceeding further with the examination of this question, to determine the nature and character of the transactions between E. Remington & Sons and the several creditors to whom such transfers were made, and whether they were mere pledges of the arms in question, so that the title remained in E. Remington & Sons, or whether they were in the nature of chattel mortgages by which the title passed to the several creditors, subject to be defeated only by a payment of the debts which they were given to secure. "A 'pledge' differs from a 'chattel mortgage' in three essential characteristics: (1) It may be constituted, without any contract in writing, merely by delivery of the thing pledged. (2) It is constituted by a delivery of the thing pledged, and is continued only so long as the possession remains with the creditor. (3) It does not generally pass the title to the thing pledged, but gives only a lien to the creditor while the debtor retains the general property." Jones, Pledges, § 4. "Whenever there is a conveyance of the legal title to personal property upon an expressed condition subsequent, whether contained in the conveyance or in a separate instrument, the transaction is a mortgage." Id. § 8. A delivery must always accompany a pledge, while a mortgage may be valid without a delivery. Jones, Chat. Mortg. § 7. "A decis-

ive test of a legal mortgage of personal property is the use of language which makes the instrument one of sale conveying the title of the property to the creditor conditionally, so that the sale is defeated by the debtor's performance of his agreement." Id. § 8.   Where A. gave a regular bill of sale of three horses to B., for the consideration of $210, and B. at the same time gave to A. a writing of defeasance engaging, on the payment of the $210 to him by A. in 14 days, to deliver the horses to A., it was held that this was a mortgage of the property, and not a technical pledge, and that, A. not having paid nor tendered the $210 within the 14 days, the condition became forfeited, and the mortgagee had an absolute interest in the property, so that A., on a subsequent tender of the money to B., and demand of the property and refusal, could not maintain trover for it. *Brown* v. *Bement*, 8 Johns. 96. In *Thompson* v. *Blanchard*, 4 N. Y. 303, a manufacturer purchased wool, to be paid for by his note, indorsed by B.   The note was made accordingly, and indorsed by B. for A.'s accommodation.   At the same time, A. executed to B. a writing reciting that B. had indorsed the note to be used in purchasing the wool, and declaring that the wool and the cloth to be manufactured therefrom should belong to B. until the note was paid.   It was held that the writing was a mere mortgage.   In *Wooster* v. *Sherwood*, 25 N. Y. 278, a brewer sold "sufficient barley now in my brewery to make malt enough, to be made in the brewery, to pay" a sum then advanced by the plaintiff, to whom a delivery was made of a specific mass of barley, more than enough for the payment. The plaintiff did not remove it, but it remained until the brewer sold his brewery and the contents, with notice of the facts, and subject to the plaintiff's claim.   The purchaser sold the barley to the defendant, and, by his direction, put it upon a railroad for transportation to the latter.   Held, the legal title and general ownership of the barley passed to the plaintiff.   The transaction was an executed sale, in the nature of a mortgage.   "A bill of sale, absolute upon its face, transferring property to be held as security for the payment of a debt due the vendee, is in character and effect a mortgage, and is to be treated as such." *Smith* v. *Beattie*, 31 N. Y. 542. See, also, *Yenni* v. *McNamee*, 45 N. Y. 614; *Bank* v. *Lang*, 87 N. Y. 209; *Siedenbach* v. *Riley*, 111 N. Y. 560, 19 N. E. Rep. 275.   The transfer by E. Remington & Sons to the National Mohawk Valley Bank was as follows:

"ILION, N. Y., 9th April, 1885.

"H. D. Alexander, Cashier National Mohawk Valley Bank, Mohawk, N. Y.   Bought of E. Remington & Sons, 1,000 Lee rifles, 433 Cal. A. B., 4 boxes, $15,500.   Above goods are sold to H. D. Alexander, cashier, and are held by him as collateral security to and for the payment of our note C, No. 10,151, dated April 9th, 1885, at three months from date, to order of and indorsed by P. Remington, for $10,000, and all renewals of the same.   Said rifles are stored in the warehouse at the N. Y. C. R. R. freight depot, Ilion, N. Y., contained in fifty cases, each case marked 'A,' and covered by receipt No. 163, signed by C. R. Mentz.   E. REMINGTON & SONS.

"By E. REMINGTON, Tr."

The transfers by E. Remington & Sons to their several creditors were all substantially alike except as to the name of the creditor, the amount of the debt, and the number of arms transferred.   We think it is quite obvious that these transfers were in the nature of chattel mortgages, and were not mere pledges of the property.   It will be observed that, by the express provisions of each of these transfers, E. Remington & Sons sold to the creditor the arms mentioned therein, to be held as collateral security for the payment of its debt. The property was in no case delivered to the creditors, but it remained in the possession of the New York Central Railroad Company.   Such a transaction did not constitute a pledge, as there was no delivery of the property pledged, and there was a sale by which the title passed.   We are of the opinion that, within the doctrine of the authorities cited, the transactions between E. Rem-

ington & Sons and their creditors were, in effect, chattel mortgages of the property. If we assume, as we think we must, that they were chattel mortgages, then the question arises whether they constituted "sales," within the intent of the agreement between these corporations. A chattel mortgage is more than a mere security. It is a conditional sale of chattels, and operates to transfer the legal title to the mortgagee, to be defeated only by full performance of the condition contained in the mortgage. Upon default, the legal title in the mortgagee becomes absolute, and he may treat the property as his own, and dispose of it as he may see fit. After default, the only right which remains in the mortgagor is an equitable right to redeem,—a mere right of action. We think it must be held that the transactions between these parties in giving such bills of sale constituted the vendees mortgagees of the property in question; that when the debts of the mortgagees became due, and the mortgagor made default, the absolute legal title to the property passed to the mortgagees; and that such transfer of title amounted to a "sale," within the intent and meaning of the contract under which the claim of the Lee Arms Company is made. If it be said that such a transfer does not amount to a technical sale, still the question is whether they were "sales," within the intent and meaning of the contract. If E. Remington & Sons had exchanged the arms in question for other property, it may be that it would not have constituted a sale, if the word "sale" was used in a restricted or limited sense; and yet no one would doubt that, under such circumstances, the corporation would have been liable, under the contract, to pay the royalties mentioned. When E. Remington & Sons mortgaged this property, and made default, we think the Lee Arms Company could have required E. Remington & Sons to pay royalties on the property thus mortgaged, although it might still have had a right in equity to redeem. If this were not so, then E. Remington & Sons could have avoided the payment of the royalties provided for by the contract by mortgaging the arms manufactured by them for their full value, then suffering default, and not redeeming therefrom. We think the word "sale" in this contract was used in a broader sense, and was intended to include any transmutation of the legal title to the property from E. Remington & Sons to another. If we are correct in our conclusion that these transfers amounted to sales, it follows that the right to the royalties on the arms thus mortgaged came into existence when such mortgages or bills of sale were given, or at least when default was made by the mortgagor, and that the royalties claimed were due before the receivers in this action were appointed. We do not think that the fact that the receivers availed themselves of the equity which rested in E. Remington & Sons, and redeemed a portion of the property mortgaged, in any way changes the question. It will be observed that this question does not arise between the mortgagor and mortgagee, and is not a question whether, as between them, the title would be reinvested in the mortgagor by redemption, or the satisfaction of the mortgagor's debt, but the only question here is whether giving the mortgage and suffering default effected a sale of the arms in question, so that the Lee Arms Company was entitled to the royalties thereon. If so, then the fact that the title again vested in the mortgagor or its representatives in no way affects the question. If the title passed, a sale was complete, and the royalties became due at that time. These considerations lead us to the conclusion that the royalties upon the arms thus transferred by E. Remington & Sons to its creditors became due before the receivers were appointed, and therefore the claim of the Lee Arms Company is against the estate, to be paid in the same proportion and in the same manner as the other debts against the estate are paid; and that it is not a claim against the receivers which should be paid in full, or in preference to the claims of other creditors. We are of the opinion that that portion of the order from which the receivers appealed should be affirmed, but that the remainder of the order should be modified by directing the receivers to pay the Lee Arms Company

$199.25, the royalties in full on the 135 arms which came into their hands, instead of a dividend thereon; and that upon the remainder there should be paid a dividend as provided by the order of the special term; and that the order, as modified, should be affirmed, with $10 costs to the appellant, payable out of the funds in the receiver's hands.

MERWIN, J., concurred.    KENNEDY, J., dissented.