[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 280 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 281 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 282 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 283 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 284 
The rights of the parties depend primarily on the construction of the contract of December 13, 1856. If, by that contract, Haight's title to the specific parcel of barley in the south part of the brewery passed to the plaintiffs, Camp, the subsequent vendee of Haight, took no interest in it, and could pass none to the defendant. Camp, by the transfer of the 14th January, 1857, took only such title as Haight then had. If he had none, Camp took nothing, and if Haight in selling the barley would have been guilty of a conversion, Camp would be equally a wrongdoer. Camp has not the shadow of equity peculiar to himself, for he was informed by Haight, when he took possession of the brewery, of the plaintiffs' claim to the parcel of barley in the south part thereof, and in substance assented to the suggestion of Haight that no part of it should be removed or disposed of until such claim was paid or satisfied.
I think that the legal title to the barley in the south part of the brewery vested in the plaintiffs by the contract of December 13, 1856, and that by such contract they obtained more *Page 285 
than a mere right of action against Haight. It amounted to a salein presenti of the property mentioned. The language too of the instrument is, "I, William S. Haight, do sell and transfer," c., and the consideration was a present one. The instrument did not specify the parcel or the quantity of barley sold. It, however, represented the subject of the sale as in the brewery, and the quantity was to be sufficient to pay the plaintiffs' note and interest, lent to Haight, and which he had used in his business. The precise subject of the sale was ascertained and fixed by the delivery made as a part of the transaction. Cotemporaneously with the execution of the agreement, the precise parcel of barley sold, viz., that in the south part of the brewery, was pointed out by Haight's agent to make delivery, and formally delivered to and accepted by the plaintiffs. There was no removal of the barley by the plaintiffs, but this did not affect or change their rights. By the terms of the contract the grain was to be malted in the brewery, and had they removed it after delivery and then brought it back to be manufactured, their rights would be the same as they now are. There can be no objection, therefore, against regarding the transaction as an executed sale, on the ground of an imperfect or insufficient delivery.
The intention of the parties in the execution of the agreement, and the formal delivery of the specific parcel of barley in the south part of the brewery, is obvious. It was to invest the plaintiffs with the legal title to the parcel for the security of themselves and Dibble. The legal title to, and control of, the barley was passed to the plaintiffs to secure Dibble's claim and the payment of the $3,000 note. In this view, it was a sale in the nature of a mortgage. The plaintiffs were to have enough of the proceeds of the property to pay the note, after satisfying Dibble's claim; and the surplus belonged to Haight.
By the sale and delivery, therefore, on the 13th December, 1856, the legal title and general ownership of the parcel of barley in the south part of the brewery passed to the plaintiffs. By leaving it with Haight to be malted, he acquired a qualified possession for that purpose only, in subordination to *Page 286 
the legal title, and the right of possession incident to it. When Camp, after taking possession of the brewery, undertook to convert the property to his own use, and dispose of a portion of it to the defendant, the legal title, with the right of possession was in the plaintiffs. Camp, in assuming to sell the barley, was a trespasser, and his act without any legal justification.
It is urged, however, that the defendant is a bona fide
subsequent purchaser of the malt of Camp, and that, as between the plaintiffs and the defendant, the referee erred in deciding that the latter wrongfully detained it. If Camp had no title to the malt in question, but was a wrongdoer in controlling and disposing of it, it is not easy to perceive how his vendee could acquire a valid title or, in respect to the property, occupy the relation of a subsequent purchaser in good faith. It may be conceded that when the owner of property, by his own voluntary act or consent, has given to another such evidence of the right of selling his goods as, according to the custom of trade in the common understanding of the world, usually accompanies the authority of disposal, the owner furnishing such indicia, or apparent authority, is bound by it, and the bona fide purchaser obtains title. But that is not this case. It does not appear that the plaintiffs had any knowledge of the transfer by Haight to Camp, or that they voluntarily gave the latter any indicia
whatever, not even possession. On the contrary, as soon as they learned that Camp had possession of their property, claiming to sell it, they brought their action against Camp, and his vendee, the defendant. Whatever apparent authority Camp had, came through the effect of the transfer by Haight to Camp, which was involuntary as to and unauthorized by the plaintiffs. If Haight could not give good title, under the same circumstances, to abona fide purchaser, without notice, Camp, the defendant's vendor, could not. That Haight, as against the plaintiffs (even conceding that the defendant was without notice of the plaintiffs' rights), could not have conveyed title to the defendant, I think is clear. Haight only had possession to manufacture the barley into malt, and *Page 287 
had no right to sell. There is nothing to show that either Haight or Camp ever manufactured malt on their own account and sold it in the usual course of trade, except the sale to the defendant; or, if they did, that the defendant knew it. But if it had been shown that Haight or Camp sold malt on their own account, the fact of the plaintiffs leaving barley at the brewery to be manufactured into malt would not furnish sufficient indicia of the right of the manufacturer to sell. In both cases, the manufacturer makes his goods, or adds labor to them, for others as well as on his own account, and hence the presumption of authority to sell does not arise. This case falls within the rule, that whoever deals with an agent constituted for a special purpose, deals at his peril, when the agent passes the precise limits of his power. If the owner loses his property, or if it is sold or pledged without his consent, by one who has a qualified possession of it for a specific purpose, as for work to be performed on it, the owner can follow and claim it in the hands of any person however innocent. (2 Kent's Com., 621; Saltus v.Everett, 20 Wend., 267; Brown v. Peabody, 3 Kern., 121.) The case of Thompson v. Blanchard (4 Comst., 303), is no authority against this view.
Nor, regarding the title of the plaintiffs as that of vendee or mortgagee, was it necessary, as against the defendant, to file the instrument of December 13, 1862, in the clerk's office of the town in which Haight resided. The defendant was not a subsequentbona fide purchaser, nor a purchaser at all from Haight. The statute only applies to purchasers from the mortgagor. But if it were otherwise, the defendant purchased from Camp, who was amala fide purchaser, and hence must be considered as occupying the same relation.
A remaining question upon the whole case is, whether the action could be maintained against the defendant without a demand; and if not, whether the demand proved was sufficient. I am inclined to the opinion that no demand was necessary. The defendant, under a claim of ownership, assumed to transport the property to or towards Buffalo, after having unlawfully acquired the possession of it. That act, and *Page 288 
the detention for that purpose, was wrongful, and a conversion. But a demand, if necessary, upon the carrier was sufficient. The carrier's possession was not only that of the defendant, but he had himself an interest in the possession by virtue of his responsibility for, and to enable him to discharge his duty to his principal. In Jones v. Hart (2 Salk., 441), it was held that the refusal of a pawnbroker's servant to redeliver goods pawned, is evidence of a conversion by his master.
But a single exception relating to the admissibility of evidence, was taken on the trial. Haight having testified "that Wooster was to have control of the barley and malt, and that he (the witness) was not to sell without consulting him," the defendant moved to strike out the statement as tending to vary or change the written contract. The defendant's counsel seems not to have made this a point on the argument. But there was no error in refusing to strike out the testimony for the reason assigned. It did not tend to vary or change the written contract. The legal effect of the contract, and the delivery of the specific parcel of barley accompanying it, was to be determined by the writing itself. The testimony had only reference to the rights of the parties as to the parcel of barley delivered for the purpose of carrying out the contract; and for this purpose, it was not improper. Had there been, however, a technical error in refusing to strike out, it is evident that the evidence could not in any way have influenced the decision of the referee.
The judgment of the Supreme Court should be affirmed.
Judgment affirmed. *Page 289