# THE PEOPLE OF THE STATE OF NEW YORK *v.* E. REMINGTON & SONS.

IN THE MATTER OF THE CLAIM OF THE LEE ARMS COMPANY.

ADDISON BRILL AND ALBERT N. RUSSELL, AS RECEIVERS, APPELLANTS AND RESPONDENTS, *v.* THE LEE ARMS COMPANY, APPELLANT AND RESPONDENT.

*Royalties — duty of a receiver to pay them — when they are preferred claims — pledge and chattel mortgage distinguished.*

Under a contract, by which the sole and exclusive right or license to manufacture, use and vend to others certain fire-arms mentioned and described therein is given, upon the payment of a certain sum for each arm manufactured and sold, " to be paid tri-monthly at the end of each and every three months," a receiver of the corporation which has manufactured, but has not sold, certain arms thereunder is bound to pay royalties upon the manufactured arms which have thus come into his possession.

Creditors of said manufacturing company, who, prior to the appointment of the receiver, for money loaned, have acquired possession of certain of said arms, and hold the same by virtue of the provision of a chattel mortgage given to secure such indebtedness, are purchasers of such arms within the contemplation of the contract, and are not liable for such royalties. (KENNEDY, J., dissenting on the ground that the paper in question constituted a pledge, and not a chattel mortgage.)

The receiver is not obliged to pay in full the licenses for arms covered by such chattel mortgage, as having a preference over other claims existing against the manufacturing company.

Under such a contract the licensor has no lien upon the arms manufactured for the payment of the license fee.

The question whether the instrument creates a pledge or a chattel mortgage, considered.

APPEAL by the Lee Arms Company from so much of an order entered, in the above-entitled matter, in the office of the clerk of the county of Herkimer on the 29th day of September, 1890, as denied the prayer of the petition of the said Lee Arms Company.

The application was made in the above-entitled matter, on behalf of the Lee Arms Company, for an order allowing a claim made against the estate of E. Remington & Sons, and directing the receiver of E. Remington & Sons to pay such claim, which was for royalties upon " Lee Arms," so called, manufactured by E. Remington & Sons, and upon which royalties had not been paid when the corporation was dissolved.

The royalties were provided for by an agreement between the parties, bearing date May 9, 1884, which contained, among others, the following provisions:

" *Second.* The parties of the first part (The Lee Arms Co.), have granted, bargained and conveyed, and do, by these presents, grant, bargain and convey, to the parties of the second part (E. Remington & Sons), and their successors, the sole and exclusive right and license to manufacture, use, and vend to others to be used, firearms." etc.

" *Fourth.* The parties of the second part, in consideration, etc., and for the right to manufacture, use and sell as aforesaid, shall yield and render to the parties of the first part the sum of $1.55 for each and every arm manufactured and sold, etc., the same to be paid tri-monthly at the end of each and every three months from the date of these presents; and the parties of the second part shall render to the parties of the first part, at the expiration of each said three months, a statement in writing, verified by some one of the officers of the parties of the second part, if required thereto, of all the arms, etc., manufactured and shipped to purchasers during the three months then next preceding. But in case the same shall not be actually delivered to and accepted by such purchasers, so that they are thrown back on the hands of the parties of the second part, they shall be entitled to have such payments refunded by the parties of the first part."

" *Fifteenth.* Should the parties of the second part fail to manufacture and sell in any one year five thousand of said arms, or, failing so to do, shall fail to pay the sums herein provided for as

part royalties or license fees on five thousand arms, which they shall have the privilege to do in lieu of making the same when there is no demand for said arms at reasonable prices, then the parties of the first part may put an end to this agreement," etc.

The Lee Arms Company made application to this court by petition, for an order instructing the receivers in this action to pay to the petitioner in full certain royalties claimed by it under the aforesaid contract.

Temporary receivers of E. Remington & Sons were appointed April 21, 1886. The corporation was dissolved and the temporary receivers were made permanent receivers June 4, 1886. At the time the receivers were appointed the corporation had, at its works, 156 finished and nine unfinished Lee arms, making 165 in all. The Lee Arms Company has purchased some of these arms of the receivers, and has been allowed royalties, on thirty leaving 135 upon which no royalties have been paid or allowed.

At the time of the appointment of the temporary receivers, as well as when such corporation was dissolved, there were in the possession of certain creditors of the corporation 8,310 Lee arms. These arms were held by such creditors under bills of sale previously given by E. Remington & Sons to them as security for money loaned to E. Remington & Sons. The arms so held have been disposed of, in some instances, by the creditors who held them, and in other cases, after default, they have been redeemed by the receivers and disposed of by them.

On the hearing of this motion the court denied the motion of the petitioner, but held that the Lee Arms Company was a creditor of the estate of E. Remington & Sons to the amount of $11,990.80 for royalties on 7,736 arms; that the petitioner was entitled to have its claim for this amount, and have the same rights and benefits thereon, so far as the assets of E. Remington & Sons remaining undistributed might render it possible, and that the receivers should pay the Lee Arms Company the same *pro rata* dividends on said claim that had been paid by them to general unpreferred creditors of the corporation, so far as the assets of the corporation then remaining undistributed might render it possible, and such further *pro rata* dividends as should thereafter be by them paid to general unpreferred creditors. From the order denying the prayer of its

petition the Lee Arms Company appealed, and from the remainder of the order an appeal was taken by the receivers.

. *Thomas Richardson*, for the receivers, appellants and respondents.

*Hornblower & Byrne*, for the Lee Arms Company, appellant and respondent.

MARTIN, J.:

We concur in the conclusion of the Special Term, that if there were assets in the hands of the receivers sufficient to pay the proper dividend upon the claim of the Lee Arms Company that it should be paid, although the time to prove debts against the estate had expired; and, therefore, are of the opinion that that part of the order which was appealed from by the receivers should be affirmed.

This leaves for consideration that portion of the order which denied the petition of the Lee Arms Company for a direction to the receivers to pay to the petitioner its royalties in full. The question presented at the outset is, whether the royalties which were due the Lee Arms Company constituted a debt against the estate in the hands of the receivers to be paid by them as other debts against the estate were paid, or whether its claim for such royalties could properly be made against the receivers and should be paid by them in full.

By an examination of the contract under which these royalties were claimed, it becomes quite obvious that it was not the intent or purpose of the contract to give the Lee Arms Company any lien upon the arms manufactured under the license therein for the royalties agreed to be paid. It contained, at most, a simple agreement by E. Remington & Sons to pay the royalties therein mentioned. The agreement was but the personal agreement of the corporation to pay, and no lien was given or intended. Nor do we find anything in this case, as presented on this appeal, which would justify the conclusion that the Lee Arms Company had any legal or equitable lien on the arms in question for such royalties which entitled it to its pay in full or in preference to other creditors.

In determining whether the petitioner's claim for these royalties was against the estate, or against the receivers, it becomes material to ascertain when the claim first came into existence. If it came

into existence before the receivers were appointed, then it seems to be admitted by all that it is against the estate only, and has no preference over claims of other creditors. If, however, it arose subsequent to their appointment, then it is claimed that the receivers should be directed to pay it in full.

The manifest purpose of the license contained in the contract between these corporations was to convey to E. Remington & Sons the right to manufacture and sell arms under the Lee patents. The license given was not alone to manufacture, but to manufacture and sell. For the right to manufacture and sell a royalty of one dollar and fifty-five cents was to be paid on each arm manufactured and sold. These royalties were not to be paid until the arms were both manufactured and sold. The claim that the debt or liability arose when the arms were manufactured, and that its payment only was postponed until after a sale, cannot, we think, be sustained. We are of the opinion that no debt or liability existed until the arms were both manufactured and sold.

It appears by the papers read on this motion that 165 arms were on hand at the armory of E. Remington & Sons when the receivers in this action were appointed. Upon thirty of these, royalties have been paid or allowed by the receivers. On the remaining 135 no royalties have been paid. The royalties on that number amounted to the sum of $199.25. As it is not claimed that there was any sale of these arms until after the receivers were appointed, it follows, we think, that this sum should be paid by the receivers in full, if they have sufficient funds in their hands.

The appeal-book also discloses that when this action was brought all the other arms in question had been transferred by bills of sale, given by E. Remington & Sons as security for money borrowed by it, at the time, of the several persons, firms or corporations to which they were given. There had been a default in each case in the payment of the debt thus secured, or some portion thereof.

It is, perhaps, proper, before proceeding further with the examination of this question, to determine the nature and character of the transactions between E. Remington & Sons and the several creditors to whom such transfers were made, and whether they were mere pledges of the arms in question so that the title remained in E. Remington & Sons, or whether they were in the nature of chattel

mortgages, by which the title passed to the several creditors, subject to be defeated only by a payment of the debts which they were given to secure.

"A pledge differs from a chattel mortgage in three essential characteristics: 1. It may be constituted without any contract in writing, merely by delivery of the thing pledged. 2. It is constituted by a delivery of the thing pledged, and is continued only so long as the possession remains with the creditor. 3. It does not generally pass the title to the thing pledged, but gives only a lien to the creditor while the debtor retains the general property." (Jones on Pledges; § 4.) "Whenever there is a conveyance of the legal title to personal property upon an express condition subsequent, whether contained in the conveyance or in a separate instrument, the transaction is a mortgage." (Id., § 8.) A delivery must always accompany a pledge, while a mortgage may be valid without a delivery. (Jones on Chattel Mortgages, § 7.) "A decisive test of a legal mortgage of personal property is the use of language which makes the instrument one of sale, conveying the title of the property to the creditor conditionally, so that the sale is defeated by the debtor's performance of his agreement." (Id., § 8.)

Where A gave a regular bill of sale of three horses to B for the consideration of $210, and B, at the same time, gave to A a writing of defeasance, engaging, on the payment of the $210 to him by A in fourteen days, to deliver the horses to A, it was held that this was a mortgage of the property, and not a technical pledge; and that A not having paid, nor tendered, the $210 within the fourteen days, the condition became forfeited and the mortgagee had an absolute interest in the property, so that A, on a subsequent tender of the money to B, and demand of the property and refusal, could not maintain trover for it. (*Brown* v. *Bement,* 8 Johns., 96.) In *Thompson* v. *Blanchard* (4 N. Y., 303) A, a manufacturer, purchased wood, to be paid for by his note indorsed by B. The note was made accordingly, and indorsed by B for A's accommodation. At the same time A executed to B a writing reciting that B had indorsed the note to be used in purchasing the wool and declaring that the wool and the cloth to be manufactured therefrom should belong to B. until the note was paid. It was held that the writing was a mere mortgage. In *Wooster* v. *Sherwood*

(25 N. Y. 278), a brewer sold " sufficient barley now in my brewery to make malt enough, to be made in the brewery, to pay " a sum then advanced by the plaintiff, to whom a delivery was made of a specific mass of barley, more than enough for the payment. The plaintiff did not remove it, but it remained until the brewer sold his brewery and the contents, with notice of the facts and subject to the plaintiff's claim. The purchaser sold the barley to the defendant, and by his direction put it upon a railroad for transportation to the latter. *Held*, the legal title and general ownership of the barley passed to the plaintiff. The transaction was an executed sale in the nature of a mortgage.

" A bill of sale absolute upon its face, transferring property to be held as security for the payment of a debt due the vendee, is, in character and effect, a mortgage, and is to be treated as such." (*Smith* v. *Beattie*, 31 N. Y., 542; see, also, *Yennie* v. *MacNamee*, 45 id., 614; *Farmers and Mechanics' Bank of Buffalo* v. *Lang*, 87 id., 209; *Siedenbach* v. *Riley*, 111 id., 560.) The transfer by E..Remington & Sons to the National Mohawk Valley Bank was as follows :

" ILION, N. Y., *9th April*, 1885.

" H. D. Alexander, Cashier, National Mohawk Valley Bank, Mohawk, N. Y. Bought of E. Remington & Sons, * * * 1,000 Lee rifles, 433 Cal., A. B., 4 Boxes—$15,500. Above goods are sold to H. D. Alexander, Cashier, and are held by him, as collateral security to and for the payment of our note C, No, 10,151, dated April 9th, 1885, at three months from date to order of and indorsed by P. Remington for ten thousand dollars and all renewals of the same. Said rifles are stored in the warehouse at the N. Y. C R. R. freight depot, Ilion, N. Y., contained in 50 cases, each case marked 'A' and covered by receipt No. 163. Signed by C. R. Mentz.

" E. REMINGTON & SONS.

" By E. REMINGTON, *Tr.*"

The transfers by E. Remington & Sons to their several creditors were all substantially alike except as to the name of the creditor, the amount of debt and the number of arms transferred. We think it is quite obvious that these transfers were in the nature of chattel mortgages and were not mere pledges of the property. It will be observed that by the express provisions of each of these

transfers, E. Remington & Sons sold to the creditor the arms mentioned therein, to be held as collateral security for the payment of its debt. The property was in no case delivered to the creditors, but it remained in the possession of the New York Central and Hudson River Railroad Company. Such a transaction did not constitute a pledge, as there was no delivery of the property pledged. and there was a sale by which the title passed. We are of the opinion that within the doctrine of the authorities cited the transactions between E. Remington & Sons and their creditors were, in effect, chattel mortgages of the property. If we assume, as we think we must, that they were chattel mortgages, then the question arises whether they constituted sales within the intent of the agreement between these corporations. A chattel mortgage is more than a mere security. It is a conditional sale of chattels, and operates to transfer the legal title to the mortgagee, to be defeated only by full performance of the condition contained in the mortgage. Upon default, the legal title in the mortgagee becomes absolute and he may treat the property as his own and dispose of it as he may see fit. After default the only right which remains in the mortgagor is an equitable right to redeem — a mere right of action.

We think it must be held that the transactions between these parties in giving such bills of sale constituted the vendees mortgagees of the property in question; that when the debts of the mortgagees became due and the mortgagor made default the absolute legal title to the property passed to the mortgagees, and that such transfer of title amounted to a sale within the intent and meaning of the contract under which the claim of the Lee Arms Company is made. If it be said that such a transfer does not amount to a technical sale, still the question is, whether they were sales within the intent and meaning of the contract. If E. Remington & Sons had exchanged the arms in question for other property, it may be that it would not have constituted a sale if the word sale was used in a restricted or limited sense, and yet no one would doubt that, under such circumstances, the corporation would have been liable under the contract to pay the royalties mentioned. When E. Remington & Sons mortgaged this property and made default, we think the Lee Arms Company could have required

E. Remington & Sons to pay royalties on the property thus mortgaged, although it might still have had a right in equity to redeem. If this were not so, then E. Remington & Sons could have avoided the payment of the royalties provided for by the contract, by mortgaging the arms manufactured by them for their full value, then suffering default and not redeeming therefrom. We think the word " sale " in this contract was used in a broader sense, and was intended to include any transmutation of the legal title to the property from E. Remington & Sons to another.

If we are correct in our conclusion that these transfers amounted to sales, it follows that the right to the royalties on the arms thus mortgaged came into existence when such mortgages or bills of sale were given, or at least when default was made by the mortgagor, and that the royalties claimed were due before the receivers in this action were appointed. We do not think that the fact that the receivers availed themselves of the equity which rested in E. Remington & Sons, and redeemed a portion of the property mortgaged, in any way changes the question. It will be observed that this question does not arise between the mortgagor and mortgagee, and is not a question whether, as between them, the title would be reinvested in the mortgagor by redemption or the satisfaction of the mortgagor's debt, but the only question here is, whether giving the mortgage and suffering default effected a sale of the arms in question so that the Lee Arms Company was entitled to the royalties thereon. If so, then the fact that the title again vested in the mortgagor or its representatives, in no way affects the question. If the title passed, a sale was complete and the royalties became due at that time.

These considerations lead us to the conclusion that the royalties upon the arms thus transferred by E Remington & Sons to its creditors became due before the receivers were appointed, and, therefore, the claim of the Lee Arms Company is against the estate, to be paid in the same proportion and in the same manner as the other debts against the estate are paid; and that it is not a claim against the receivers which should be paid in full or in preference to the claims of other creditors.

We are of the opinion that that portion of the order from which the receivers appealed should be affirmed, but that the remainder of

the order should be modified by directing the receivers to pay the Lee Arms Company $199.25, the royalties in full on the 135 arms which came into their hands instead of a dividend thereon; and that upon the remainder there should be paid a dividend as provided by the order of the Special Term, and that the order as modified should be affirmed, with ten dollars costs to the appellant, payable out of the funds in the receivers' hands.

MERWIN, J., concurred.

KENNEDY, J. (dissenting):

By the agreement between the Lee Arms Company and E. Remington & Sons the one dollar and fifty-five cents royalty to be paid by the latter to the former was only to be paid for each and every gun manufactured and *sold*, the same to be paid tri-monthly, and at the end of each and every three months from the date of the contract. The actual sale of each gun by E. Remington & Sons was a necessary condition precedent to entitle the Lee Arms Company to be paid said royalty.

Among the arms not sold, as claimed by the Lee Arms Company at the time the receivers were appointed, were the following, which E. Remington & Sons had pledged to the several persons named, and to the number mentioned, as collateral security for the payment of certain debts owing by them:

R. J. Dean & Co., 1,600 rifles; Tradesman's Bank, 2,000 rifles; Hartley & Graham, 500 rifles; Thomas Richardson, 220 rifles; National Mohawk Valley Bank, 1,000 rifles; Canajoharie National Bank, 10 rifles.

Were these arms so pledged by E. Remington & Sons as security for the payment of the several obligations, the pledges, respectively, held against said firm, and which had not been sold or disposed of by them at the time the receivers were appointed, sold by E. Remington & Sons, within the intent and meaning of the contract for royalty between it and the Lee Arms Company?

We think the disposition of the guns by E. Remington & Sons in the manner stated did not amount to a sale, and that the title to each remained in them and passed to the receivers at the time of their appointment, subject only to the pledge.

This transfer of the guns was not in effect a mortgage. The cor-

rect definition of a chattel mortgage is, that it is an instrument of sale, conveying the title of the property mortgaged to the mortgagee, with terms of defeasance, and if the terms of redemption are not complied with, then, at law, the title becomes absolute in the mortgagee. To make it a mortgage, the effect of the agreement must be such that, by the mere non-performance of the conditions by the mortgagor, the title will be transferred to the mortgagee by force of the agreement. (Story on Bailment, §§ 287, 288; 2 Kent's Com., 582; *Brownell* v. *Hawkins,* 4 Barb., 491; *Langdon* v. *Buel,* 9 Wend., 83; *Brown* v. *Bement,* 9 Johns., 96; *Garlick* v. *James,* 12 id., 146; *Stearns* v. *Marsh,* 4 Denio, 227; *Cortelyou* v. *Lansing,* 2 Caine's Cas., 200.)

On the other hand, a pledge consists of a delivery of goods by a debtor to his creditor, to be held until the debtor's obligation is discharged and then to be delivered to the pledgor, the title not being changed during the continuance of the pledge. (Story on Bailment, § 286.)

In case of a pledge, as security for the payment of a debt, the only way the pledgee can avail himself of the pledge, is to demand payment after default, and if refused, to sell the property, after notice to the pledgor, at public sale, and apply the proceeds to discharge the obligation or to foreclose the lien in equity. Until this is done the title remains in the pledgor. The 500 guns held by Hartley & Graham and the ten by the Canajoharie National Bank were subsequently returned by the respective pledgees to the receivers without anything being paid to either of them, the debts for which they were pledged having been paid out of the proceeds of other securities held by the creditors. These guns were subsequently sold by the receivers, and the proceeds formed a part of the assets in their hands. These 510 rifles, separated from the remainder of those pledged, were not, therefore, sold by E. Remington & Sons before the appointment of the receivers, and as to them no royalty had become due or owing to the Lee Arms Company at the time of their said appointment. We are, therefore, of the opinion that as to these the receivers contracted the debt for the royalties after their appointment, and that the same should be paid in full, provided the condition of the estate will permit the same to be made out of the assets remaining in their hands.

We are also of the opinion that the remaining arms which had been pledged, as aforesaid, by E. Remington & Sons, as collateral security for the payment of debts owing by them, and which had not been actually sold by the pledgees, cannot be regarded as having been sold by E. Remington & Sons, within the meaning of the contract, at the time the receivers were appointed; and said guns having either been returned by the pledgees to the receivers, or subsequently sold by the pledgees, and the proceeds applied to discharge the debts, the receivers became liable to pay the royalties, and that such royalties upon these other guns was an obligation contracted by the receivers after their appointment, and for the benefit of the estate, and that the same should be paid in full upon the condition and in the manner provided for the payment of the royalties upon the 510 rifles mentioned.

If correct in the conclusions reached, it follows that the order made at Special Term should be so modified as to direct the receivers, out of any property or assets in their hands, to pay the Lee Arms Company the royalty of one dollar and fifty-five cents upon the whole 8,410 rifles pledged by E. Remington & Sons to their creditors for the payment of debts owing by said firm and remaining in the possession of the pledgees undisposed of at the time the receivers of E. Remington & Sons were appointed, in full if the assets remaining in their hands are sufficient for that purpose, with ten dollars costs and disbursements, to the Lee Arms Company.

Order modified by directing the receivers to pay the Lee Arms Company $199.25 royalties on 135 arms, and that upon the remainder they pay it a dividend as directed in the order of the Special Term, and as modified, order affirmed, with ten dollars costs and disbursements to Lee Arms Company, to be paid out of fund in the receivers' hands.